PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

KEVIN ANGELO ROBINSON, a/k/a
Bone,

*Defendant-Appellant.*

No. 09-4276

Appeal from the United States District Court
for the District of South Carolina, at Aiken.
Margaret B. Seymour, District Judge.
(1:06-cr-01000-MBS-2)

Argued: September 24, 2010

Decided: December 1, 2010

Before WILKINSON, AGEE, and DAVIS, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the
opinion, in which Judge Agee and Judge Davis joined.

## COUNSEL

**ARGUED**: Nicole Nicolette Mace, THE MACE FIRM, Myr-
tle Beach, South Carolina, for Appellant. Stanley Duane
Ragsdale, OFFICE OF THE UNITED STATES ATTOR-
NEY, Columbia, South Carolina, for Appellee. **ON BRIEF:**

Kevin F. McDonald, Acting United States Attorney, Columbia, South Carolina, for Appellee.

---

**OPINION**

WILKINSON, Circuit Judge:

Kevin Robinson led a crack cocaine distribution network in which he and his associates repeatedly sold crack cocaine for money, sex, and stolen firearms. He was convicted on numerous drug trafficking and firearms charges and sentenced to fifty years in prison. Robinson seeks a retrial because some of the officers investigating him engaged in unrelated misconduct. Like the district court we condemn their actions, but for the reasons stated herein, we do not believe the trial court abused its discretion in denying Robinson a new trial.

Robinson also seeks to benefit from the lack of doctrinal clarity surrounding 18 U.S.C. § 924(c), which prohibits using or carrying a firearm during and in relation to a drug trafficking offense or possessing a firearm in furtherance of one. Though his jury was, in hindsight, erroneously instructed that his drugs-for-firearms trades satisfied the first prong of § 924(c), Robinson's amply proven conduct nonetheless falls squarely within the second. Accordingly, we affirm the judgment.

I.

We begin by briefly summarizing the investigations that led to Robinson's trial and convictions. Because his retrial request centers on subsequently discovered police misconduct, we shall recount the alleged misconduct and the involved officers' roles in Robinson's investigation and trial with some care.

## A.

In the fall of 2005, the Criminal Investigation Division ("CID") of the Aiken County Sheriff's Office in South Carolina began investigating a string of residential firearm burglaries. The investigation soon turned up several suspects, who were arrested in early 2006. Investigator Stacey Prince of CID then learned that some of the stolen firearms had been taken out of state, so she contacted Special Agent Lee Baldwin of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") for assistance. Interviews with the suspected burglars and others revealed that they had traded some of the stolen firearms to Robinson in exchange for drugs. Special Agent Baldwin then asked the Narcotics Division of the Aiken County Sheriff's Office to conduct a controlled buy from Robinson's house, which it did. Though both are part of the Aiken County Sheriff's Office, the Narcotics Division is separate from CID, and CID does not have access to Narcotics Division files.

Based in part on this purchase and on Special Agent Baldwin's interviews with the burglars and others, the ATF obtained and executed a federal search warrant, with some Narcotics Division assistance, in August 2006. Special Agent Baldwin asked the Narcotics Division to help with another controlled buy in September 2006, and this controlled buy, along with information gleaned from interviews and from the August 2006 buy and search, supported another federal search warrant conducted with Narcotics Division help in September 2006. From these searches and interviews, investigators gathered substantial evidence that Robinson led a crack cocaine distribution ring, that he often traded drugs for stolen firearms, and that he illegally possessed firearms. Robinson and two co-defendants were indicted for various drug trafficking and firearms charges on September 13, 2006.

Though CID and ATF investigators did not know it at the time, Robinson's house at 188 Easy Street had already

attracted the Narcotics Division's independent attention. In December 2005 the Narcotics Division had conducted its own controlled buy and executed a state search warrant, finding and seizing drug evidence and firearms. Robinson faced pending state charges from this incident, but Special Agent Baldwin and the CID did not learn of them until a month prior to Robinson's federal trial. Robinson's former cellmate informed Special Agent Baldwin of the December 2005 search, and federal prosecutors added charges stemming from that investigation in a third superseding indictment.

Robinson and his co-defendants received a five-day jury trial. The government introduced the testimony of law enforcement officers from CID, ATF, and the Narcotics Division, the testimony of nineteen cooperating witnesses or co-defendants, and the evidence obtained in the three buys and searches. He was convicted on twelve counts:

- Conspiring to possess with intent to distribute, and to distribute, fifty or more grams of crack cocaine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846 (Count 1);

- Using and carrying firearms during and in relation to, and possessing firearms in furtherance of, drug trafficking offenses on three occasions, in violation of 18 U.S.C. § 924(c) (Counts 3, 9 and 25);

- Conspiring to use and carry and possess firearms as prohibited by § 924(c), in violation of 18 U.S.C. § 924(o) (Count 2);

- Possessing firearms as a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Counts 4, 13 and 26);

- Distributing crack cocaine, in violation of 21 U.S.C. § 841(a)(1) (Counts 18, 19, and 23); and

- Possessing crack cocaine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) (Count 24).

## B.

The week after Robinson's trial, Investigator Crowell of the Narcotics Division informed Special Agent Baldwin that he and several other Narcotics Division officers who worked Robinson's case had committed misconduct. With Special Agent Baldwin's encouragement, Crowell reported these incidents to the Aiken County Sheriff's Office, beginning an investigation that ultimately led to the termination or resignation of four officers on Robinson's case: Crowell, Owenby, Roberts, and Owens.[1] Prior to these incidents, none of the officers' personnel files contained evidence of misconduct. The South Carolina Law Enforcement Division investigated and produced a report detailing four instances of misconduct:

- On May 3, 2007, Crowell and Owenby used "buy money" —county funds used to purchase illegal drugs in undercover operations—to gain entrance to and buy alcoholic drinks at a club. The officers repaid the funds prior to monthly budget reconciliation. Crowell admitted this conduct, but Owenby retained counsel and declined to be interviewed.

- On September 13-14, 2007, Crowell, Owenby, and Roberts again used Crowell's buy money to purchase drinks, as well as pay dancers, at a club. Crowell and Roberts left the club with a woman to go to her house, with Owenby joining them later. Crowell, Owenby, Roberts, and the woman then left, and the officers used buy money to purchase a hotel room for the night. Scared at the

---

[1]For convenience we will refer to them collectively as the "dismissed officers" even though one of them in fact resigned.

sight of a badge, the woman asked to be taken home. Again, the funds were repaid prior to reconciliation. Crowell admitted the conduct, but the others involved declined interviews.

- In late 2005 or early 2006 Crowell improperly disposed of cocaine purchased by an informant after failing to log it. Crowell confessed and Owens knew about the incident, but both officers passed polygraphs indicating they committed no other misconduct related to this evidence.

- Crowell, Owens, Owenby, and Roberts allegedly drank alcohol purchased in underage alcohol buys. Crowell admitted that he took such evidence home on several occasions, and Owens admitted taking some home with Owenby's permission. Crowell indicated that all of the officers occasionally drank on the job, possibly even drinking some of this evidence. Crowell did not properly record his underage buys, but others did.

Although none of this misconduct related to Robinson's case, the dismissed officers were involved, in varying degrees, with each of the buys and associated searches:

*December 2005 buy and search*: The Narcotics Division wired Marty Baggott for an informant purchase. Owenby searched Baggott before the purchase, drove Baggott to Robinson's house, and collected the drugs. Investigator Myers, who did not take part in the misconduct, supervised the buy and monitored the recording equipment with Crowell. Based on the buy, Myers and other Narcotics officers received and executed a search warrant for Robinson's home. Owens took photos, and he seized and bagged 4.03 grams of crack and 0.07 grams of powder cocaine. Crowell served as evidence custodian and collected drug paraphernalia after Owens pho-

tographed it. Owenby seized a revolver and ammunition. Federal officials played no role in either the buy or the search.

At trial, the government played the recording of the buy and introduced the 0.18 grams of crack purchased in it. Myers, Owenby, and Baggott testified to their involvement in the buy, and Crowell, Owenby, and Owens testified to their roles in the search. Myers later stated he saw no improprieties during the search or during his time in the Narcotics Division. The evidence gained in this buy and search formed the basis for Counts 23 through 26.

*August 2006 buy and search*: At Baldwin's direction, the Narcotics Division conducted a controlled buy from Robinson using informant Theresa Kelly. Roberts led the operation, searched the undercover car before and after the buy, took the 0.459 grams of crack purchased, and checked the recording. Crowell helped with surveillance, searched Kelly before and after, and wired her. Owens and Owenby monitored the officer who drove Kelly to Robinson's house. Based in part on this buy and on statements from the robbers, Baldwin obtained a federal search warrant for Robinson's house. All of the dismissed officers helped execute this warrant, though Special Agent Baldwin was solely responsible for identifying, seizing, and processing evidence. Moreover, Special Agent Baldwin later stated that Narcotics Division officers would have been paired with ATF agents. The search turned up a .22 rifle in Robinson's closet, ammunition, and drug paraphernalia such as digital scales, baggies, and video monitoring equipment.

Count 18 stemmed from this buy. The government played the tape of the buy at trial, and Crowell and Roberts testified to their involvement. The government also introduced the evidence seized during the search and had Baldwin testify about it.

*September 2006 buy and search*: Again at Baldwin's direction, Kelly made a controlled purchase of crack from Robin-

son and his associate and co-defendant Thomas Price. Owens led the operation, searched Kelly before and after, monitored the tape, and got the crack from Kelly after the buy. Based in part on this purchase, the August 2006 buy and search, and the post-arrest statements of Robinson's eventual co-defendant Stacey Stevens, Baldwin secured another federal search warrant. The search turned up some drug paraphernalia and, in Robinson's closet, a list of law enforcement radio frequencies. While all of the dismissed Narcotics Division officers took part, Baldwin again was solely responsible for evidence collection and ATF agents would have been paired with them.

At trial, the government played the tape of the buy. The drugs purchased formed the basis for Count 19. Owens testified to the buy and his role in it, but Baldwin testified about the search and its results.

After learning of the dismissed officers' misconduct, Robinson moved for a new trial on all counts under Rule 33 of the Federal Rules of Criminal Procedure. The district court initially granted this motion in its entirety, finding that the misconduct "[went] to the integrity of the investigation." Upon reconsideration, the district court limited its grant of a new trial. Because "the investigation was initiated by" the ATF and CID, the counts "based on evidence gathered during this investigation" and not the Narcotics Division investigation did not require retrials. Those counts based on the Narcotics Division's investigation—18, 19, and 23 through 26—still required retrial, but the government successfully moved to withdraw them. Robinson was sentenced to 600 months on the remaining counts and appealed.

## II.

Robinson contends that because of the police misconduct evidence he deserves a new trial on all counts under Federal

Rule of Criminal Procedure 33, not just on the now-dismissed ones.

Rule 33 states that "the court may vacate any judgment and grant a new trial if the interest of justice so requires." We review the district court's Rule 33 decision for abuse of discretion. *See, e.g.*, *United States v. Fulcher*, 250 F.3d 244, 249 (4th Cir. 2001). In analyzing whether newly discovered evidence requires a new trial, we look to five factors:

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

*United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993) (quoting *United States v. Bales*, 813 F.2d 1289, 1295 (4th Cir. 1987)). "Without ruling out the possibility that a rare example might exist, we have never allowed a new trial unless all five elements were established." *Fulcher*, 250 F.3d at 249. Because the government concedes the first and second factors, we focus on the nature of the newly discovered evidence, its materiality to Robinson's case, and its likely effect at a new trial.

## A.

Robinson lays heavy emphasis on the district court's preliminary conclusion that the police misconduct evidence "[went] to the integrity of the investigation." He argues that because the dismissed officers controlled the December 2005 buy and search, played active parts in the others, and were partially responsible for the physical evidence introduced

along with their testimony at trial, evidence of their improprieties transcends mere impeachment and goes to the core of the government's case.

If Robinson is contending that his is the rare case in which newly discovered impeachment evidence is enough for a retrial, he is mistaken. *Custis*'s sketch of this category's definition indicates its narrow scope:

> If the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed because he had lied consistently in a string of previous cases, the district judge would have the power to grant a new trial . . . .

*Custis*, 988 F.2d at 1359 (quoting *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991)). It should go without saying that Robinson's situation does not resemble that one. The dismissed officers' testimony was amply corroborated by that of other law enforcement officials and Robinson's associates. Moreover, the officers' misconduct, while serious, did not relate to Robinson's case or to the truth-finding function of the criminal proceeding. We thus reiterate our reluctance to order retrials because of subsequently discovered impeachment evidence. To do so would invite fishing expeditions into the backgrounds of witnesses and insubstantial Rule 33 motions resulting therefrom. Such a development could deprive witnesses of a decent sense of closure and undermine the finality of criminal proceedings to an unacceptable degree.

If Robinson is instead contending that the misconduct evidence serves some purpose other than impeachment, we are at a loss as to what that purpose could be. Unlike the evidence in those few cases in which we have ordered or allowed a retrial, the misconduct evidence does not directly support some alternate theory of the crimes, nor does it provide any legal justification for Robinson's actions. *See, e.g.*, *Fulcher*,

250 F.3d at 250-51 (newly discovered evidence that a law enforcement officer authorized the defendants' criminal conduct required a retrial). Instead, the evidence is offered to cast doubt on the testimony of the dismissed officers and the evidence they helped to collect, about as textbook an example of impeachment evidence as there could be. *See Custis*, 988 F.2d at 1359-60 (the misconduct evidence was impeachment evidence because it "involved . . . unrelated [matters], with issues that had no bearing on those at [the defendant's] trial"); *Black's Law Dictionary* 820 (9th ed. 2009) (defining "impeach" as "[t]o discredit the veracity of (a witness)").

The evidence also throws into stark relief the problems associated with unrelated misconduct evidence in general and retrials based on such evidence in particular. Misconduct evidence like this, which involved witnesses in Robinson's case but did not relate to those witnesses' investigation of that case, is likely to push the parties toward miniature credibility trials and to cut into the limits the Rules of Evidence place on information about diversionary and subsidiary issues. *See Custis*, 988 F.2d at 1359 n.1; Fed. R. Evid. 403; Fed. R. Evid. 608(b). Retrials based on such evidence combine these inherent problems with the added cost and delay of a new trial. The district court was entitled to take cognizance of this as well as the fact that second trials are often not as fresh, spontaneous, or reliable as first ones.

### B.

Nor can Robinson demonstrate that the evidence is material. He notes that the district court's decision to require retrials on the now-dismissed counts demonstrates its view that the misconduct evidence was material to some of his convictions. According to him, the district court erred, however, in thinking that the remaining counts—that is, the non-dismissed ones— could be cleanly separated from the affected ones. The dismissed officers played some role in obtaining evidence for each count, and the jury was not presented with compartmen-

talized, count-by-count evidence but rather with an undifferentiated mass of what he considers tainted and untainted evidence.

Robinson again overstates the impact of the dismissed officers on his trial and undervalues the district court's ultimate conclusion. As the court found after gathering further information and as the facts above illustrate, the remaining counts stemmed largely from the separate CID/ATF investigation. As a result, the misconduct evidence says little about Robinson's guilt or innocence on these counts. *See Custis*, 988 F.2d at 1359. *Fulcher* found materiality and awarded a retrial where the newly discovered evidence went directly to the defendants' chief defense. *See Fulcher*, 250 F.3d at 254-55. By contrast, the misconduct evidence here is material to the remaining counts only if we ignore the district court's sound conclusion that the dismissed officers played only bit parts in the separate CID/ATF investigation. The trial court had the best vantage point in deciding what counts were tainted, and we are loath to disturb the discretion of the judge most familiar with the first trial on the matter of whether and to what extent a second trial was necessary.

## C.

Finally, Robinson cannot demonstrate that the evidence, if introduced at a new trial, would "probably produce an acquittal." *Custis*, 988 F.2d at 1359. He suggests the dismissed officers were so central as to alter the government's whole case: by his account, the search warrants and their fruits would have been thrown out because some of the dismissed officers testified in support of the warrants upheld at the suppression hearing, the testimony of the dismissed officers would be questioned, and the testimony of witnesses who had previous contact with the dismissed officers would be called into question. This argument has a number of problems.

First, it overemphasizes the importance of the officers' testimony and the likely effect of including evidence of their

misconduct. As the district court specifically found and as the discussion above illustrates, CID and ATF did the lion's share of the work on the remaining convictions. The offending Narcotics Division officers played only minor or subordinate roles. Evidence that some of those officers engaged in wrongful conduct unrelated to Robinson's case would do little to undermine the largely separate investigation's results, especially where unaffected officers were paired with the dismissed ones and where Special Agent Baldwin supervised the evidence gathering.

Second, Robinson's contention ignores the impressive amount of evidence against him from other sources. Even when one eliminates all traces of evidence from the dismissed officers, there remains overwhelming evidence of Robinson's guilt. Nineteen co-defendants and cooperating witnesses testified that Robinson conspired to traffic drugs. For example, Dorothy Blitchington stated that she and her burglar friends sold numerous guns to Robinson and his associates for crack, testimony echoed by Anthony Clark, Crystal Newsome, and Christopher Arthur. Stacey Stevens testified that he had purchased crack from Robinson and for him and that he had observed at least four others selling drugs for Robinson. Marqual Cunningham testified that he and Robinson would sell each other cocaine when they ran low on supplies and identified four of Robinson's drug runners. And that was just the beginning. We know that the jury credited much of it; the jury held Robinson accountable for fifty or more grams of crack, though the physical evidence introduced amounted to less than ten.

So too for Robinson's other remaining convictions. Robinson's first § 924(c) conviction (Count 3) and a felon-in-possession conviction (Count 4) stemmed from his trade of crack cocaine to Chris Arthur in exchange for one of two stolen Glock .40 pistols. The pistols' owner, a retired police officer, testified to their theft; Arthur testified that he stole and traded one of the specially marked pistols to Robinson;

Newsome testified that she accompanied Arthur to Robinson's and watched the trade; and several of Robinson's co-conspirators testified to seeing the distinct weapon in Robinson's possession.

Similarly overwhelming evidence supported Robinson's second § 924(c) conviction (Count 9). The firearms' owner testified to their theft, Arthur again testified to stealing them and trading one to Robinson's co-conspirator Gilstrap, and Gilstrap testified to trading drugs for firearms with Arthur. And though Robinson's second felon-in-possession conviction (Count 13) stemmed from a .22 rifle seized in the August 2006 search, Robinson's possession of it was amply demonstrated by testimony from several of Robinson's co-conspirators. It strains credulity to claim that evidence regarding the unrelated misconduct of a few of the officers who testified at Robinson's trial could have undermined Robinson's thoroughly demonstrated guilt.

Robinson cannot demonstrate *Custis*'s third, fourth, or fifth factors on his remaining convictions. The district court therefore did not err, let alone abuse its discretion, in partially denying him a retrial.

### III.

Robinson does not pin his retrial hopes on Rule 33 alone. He also argues that he deserves an entirely new trial because the government suppressed the misconduct evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Because prosecutors did not actually or constructively possess knowledge of the officers' misconduct for *Brady* purposes and because Robinson cannot meet *Brady*'s materiality requirement, we reject his attempt to recast his defunct Rule 33 claim in *Brady* terms.

### A.

Robinson argues that basic *Brady* principles compel the conclusion that the prosecution suppressed the misconduct

evidence. First, unlike *Custis* and Rule 33 generally, *Brady* covers impeachment as well as exculpatory evidence. *See, e.g.*, *Giglio v. United States*, 405 U.S. 150, 154 (1972). Second, *Brady* applies wherever evidence is suppressed, regardless of the prosecutor's motivations. *See, e.g.*, *United States v. Agurs*, 427 U.S. 97, 110 (1976). Finally, *Brady*'s commands do not stop at the prosecutor's door; the knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of prosecutors' actual awareness. *See, e.g.*, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."). Because the dismissed officers obviously knew about their own misconduct and because they were working on the government's behalf, Robinson argues the prosecution violated its duty to disclose those improprieties even though no prosecutor actually knew about them.

Whatever the proper scope of *Brady*'s imputed knowledge doctrine, it cannot be this broad. If it were, every case analyzing retrials for subsequently discovered police misconduct under Rule 33 would be thrown into question. On Robinson's view, they should all have instead been *Brady* cases because the officers necessarily knew of their own misconduct and that knowledge is imputed to prosecutors, and therefore the courts' Rule 33 restrictions on retrials are at best unnecessary.

Robinson's view would not only undermine the framework of Rule 33. It would also impose unacceptable burdens on prosecutors and the police. Courts have routinely refused to extend *Brady*'s constructive knowledge doctrine where doing so would cut against the agency principles underlying imputed knowledge and would require prosecutors to do full interviews and background checks on everyone who touched the case. *See, e.g.*, *United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) (refusing to impute knowledge from expert witness who was not involved with the actual investigation); *Moreno-*

*Morales v. United States*, 334 F.3d 140, 146-47 (1st Cir. 2003) (refusing to impute knowledge from Puerto Rico's Senate); *United States v. Beers*, 189 F.3d 1297, 1304 (10th Cir. 1999) (refusing to impute knowledge from state investigators to federal prosecutors). And with good reason: it is one thing to require prosecutors to inquire about whether police have turned up exculpatory or impeachment evidence during their investigation. It is quite another to require them, on pain of a possible retrial, to conduct disciplinary inquiries into the general conduct of every officer working the case.

We draw no hard and fast lines here about the scope of *Brady* imputation, and we reiterate that prosecutors have a duty to learn of exculpatory evidence gathered by those acting on the government's behalf. But on the facts of this case — where the affected officers and the prosecutors worked across state/federal lines, where no one other than the officers themselves had any idea of any impropriety, and where the misconduct evidence was unrelated to Robinson's own investigation — the principle of imputed knowledge cannot be said to apply.

B.

Even if *Brady* did cover the alleged "suppression" at issue here, Robinson cannot show that there is a "reasonable probability" that he would not have been convicted had the misconduct evidence been introduced. *Strickler v. Greene*, 527 U.S. 263, 296 (1999). *Brady*'s materiality requirement asks whether the suppressed evidence, including impeachment evidence, "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435.

The misconduct evidence here pales in comparison with that suppressed in cases where *Brady*'s materiality requirement was actually met. The dismissed officers were not "the only witness[es] linking [Robinson] with the crime[s]."

*Giglio*, 405 U.S. at 151. Rather, numerous other law enforcement officers and more than a dozen co-defendants or cooperating witnesses corroborated each other's testimony and the physical evidence demonstrating Robinson's crimes. Nor did the misconduct evidence cut into a "somewhat thin and entirely circumstantial" government case. *Monroe v. Angelone*, 323 F.3d 286, 302 (4th Cir. 2003); *see also Spicer v. Roxbury Corr. Inst.*, 194 F.3d 547, 559-61 (4th Cir. 1999) (suppressed impeachment evidence was material because no physical evidence existed and eyewitness testimony was weak). Instead, physical evidence, whose collection was largely supervised by Special Agent Baldwin, and the eyewitness accounts of numerous co-conspirators and others amply proved the government's contentions. Evidence regarding a few officers' unrelated misconduct could do little to damage the extensive physical and testimonial foundation of the case.

## IV.

Robinson also argues that his § 924(c)-related convictions require reversal because of incorrect jury instructions and insufficient evidence. Section 924(c) contains two prongs, the "use or carry" prong and the "possession" prong. The first provides a mandatory minimum sentence for anyone who "during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm." 18 U.S.C. § 924(c)(1)(A). The second provides a mandatory minimum for anyone who "in furtherance of any such crime[ ] possesses a firearm." *Id.*[2] Robinson was indicted under both prongs in

---

[2]In full, § 924(c) states:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United

each of Counts 2, 3 and 9. The district court instructed the jurors that "the trading of a firearm for a controlled substance constitutes use of such firearm during and in relation to a drug trafficking crime." Robinson did not object.

At the time, this instruction fully accorded with the law in a majority of our sister circuits, *see Watson v. United States*, 552 U.S. 74, 78 n.5 (2007) (noting which circuits agreed and disagreed), as well as with our unpublished decisions, *see, e.g*, *United States v. Belcher*, No. 98-4845, 1999 WL 1080103 (4th Cir. Nov. 29, 1999) (per curiam). Before Robinson's appeal, however, the Supreme Court held that one who trades drugs for firearms does not "use" those firearms under § 924(c). *Watson*, 552 U.S. at 83. Robinson contends that *Watson* upends his convictions in two ways. First, he argues that the erroneous instruction itself requires reversal. Second, he argues that because *Watson* precludes a conviction under § 924(c)'s use prong, the government's evidence, which largely demonstrated that he traded drugs for firearms, was insufficient.

## A.

Robinson did not object to the jury instructions at the time. His counsel rightly acknowledged at oral argument that this failure means we review those instructions for plain error. Rule 30 requires that defendants object to instructions "before the jury retires to deliberate" or face plain error review under Rule 52(b). Fed. R. Crim. P. 30(d). This rule applies even where settled law at the time of trial rejected the defendant's

States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime . . . be sentenced to a term of imprisonment of not less than 5 years . . . .

18 U.S.C. § 924(c)(1)(A)(i) (subsection division omitted).

position. *See Johnson v. United States*, 520 U.S. 461 (1997) (applying plain error review to an unchallenged jury instruction error where the law at trial was clear but had been reversed prior to appeal). This rule is necessary to avoid casual reversal of district courts who follow settled law to which no objection was raised at trial.

Under the plain error standard, Robinson must establish that the district court erred, that the error was plain, and that it "affect[ed] [his] substantial rights." *United States v. Olano*, 507 U.S. 725, 734 (1993) (quoting Fed. R. Crim. P. 52(b)). Even if Robinson makes this showing, we retain discretion to deny relief; plain errors should only be corrected where not doing so would result in a "miscarriage of justice," *Olano*, 507 U.S. at 736 (quotation omitted), or would otherwise "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings," *id.* at 736 (quotation omitted).

In light of *Watson*, the district court's use instruction was plainly erroneous. *See Johnson*, 520 U.S. at 468 ("[W]here the law at the time of trial was settled and clearly contrary to the law at the time of appeal," the trial court's use of the prior settled law is plain error.). But Robinson cannot prove that the error "actual[ly] prejudiced" him as required under *Olano*'s third prong. *United States v. Myers*, 280 F.3d 407, 414 (4th Cir. 2002). In *United States v. Hastings*, 134 F.3d 235 (4th Cir. 1998), we discussed how plain error review's prejudice requirement applies where a defendant was indicted under multiple prongs of an offense but subjected to erroneous jury instructions on one of those prongs. We held that such a defendant "must demonstrate that the erroneous . . . instruction given . . . resulted in his conviction," not merely that it was impossible to tell under which prong the jury convicted. *Id.* at 243-44.

Applying this standard, *Hastings* upheld the defendant's § 924(c) conviction despite an erroneous use instruction because the jury's conviction under that instruction necessar-

ily included findings sufficient to convict under the also-charged carry portion of § 924(c). *See id.* at 244. Therefore, Hastings could not demonstrate that the erroneous use instruction actually prejudiced him. If the possession prong—added to § 924(c) after *Hastings* — merely adds another way of committing an offense, *Hastings* squarely applies and Robinson must prove that his conviction must have stemmed from the erroneous use instruction and the erroneous use instruction alone.

But there is a possible wrinkle in applying *Hastings* to Robinson's case. The circuit courts are divided on whether § 924(c) creates one offense or two. *Compare United States v. Gamboa*, 439 F.3d 796 (8th Cir. 2006) (two offenses), *and United States v. Combs*, 369 F.3d 925 (6th Cir. 2004) (same), *with United States v. Haynes*, 582 F.3d 686 (7th Cir. 2009) (one offense), *and United States v. Arreola*, 467 F.3d 1153 (9th Cir. 2006) (same). There is a formal difference between requiring proof that a general verdict did not stem exclusively from an erroneously instructed prong of one offense, as *Hastings* did, and requiring proof that a general verdict did not stem exclusively from an erroneously instructed offense, though the situations are analogous, *see Griffin v. United States*, 502 U.S. 46, 49-50 (1991). The question is whether that difference matters here.

We do not think that it does, and so we need not decide how many offenses § 924(c) creates. Where the two offenses were combined in one count there is little functional difference between a general verdict that could have been based on an erroneous offense instruction and one that could have been based on an erroneous means of offense instruction; in both cases the defendant may have been convicted on a legally inadequate ground, but we cannot tell because of the general verdict.[3]

---

[3]Robinson contends that his indictment duplicitously charged him with multiple offenses in single counts. Whatever duplicity problems result from indictments such as his should be dealt with directly rather than through modifications of plain error doctrine.

In keeping with plain error review's placement of the burden on the defendant, and in view of *Hastings*'s teaching that the error must have actually resulted in prejudice and not merely possible or speculative prejudice, *see Hastings*, 134 F.3d at 243-44, such a defendant would still have to show that the erroneously instructed offense underlies his conviction, not the proper one. In other words, Robinson must show not only that he *could* have been convicted under the erroneous use instruction, but also that he *was not* convicted under the properly-instructed possession prong. Given the evidence and the jury instructions, Robinson could have been convicted under the erroneous use instruction. But the fact that he was convicted under § 924(c) at all demonstrates that his convictions also satisfied the properly instructed possession prong. To convict, the jury must have found that Robinson traded drugs for firearms. But because we hold that trading drugs for guns constitutes possession in furtherance within the meaning of § 924(c), Robinson could also have been convicted under the properly instructed possession prong. He therefore cannot show that his conviction resulted from the erroneous charge.

By holding that § 924(c)'s possession prong covers drugs-for-firearms trades, we align ourselves with a growing and consistent body of post-*Watson* precedent. Though *Watson* itself refrained from deciding the issue, *see Watson*, 552 U.S. at 83, every circuit court to have reached the question has agreed that such trades constitute possession in furtherance. *See United States v. Gurka*, 605 F.3d 40 (1st Cir. 2010); *United States v. Gardner*, 602 F.3d 97 (2d Cir. 2010); *United States v. Doody*, 600 F.3d 752 (7th Cir. 2010); *United States v. Mahan*, 586 F.3d 1185 (9th Cir. 2009); *see also United States v. Sterling*, 555 F.3d 452 (5th Cir. 2009) (assuming without deciding that such trades constitute possession in furtherance).

The striking uniformity here is no surprise, as this interpretation flows naturally from § 924(c)'s text. Those who trade drugs for firearms necessarily "possess" those weapons, as

every successful trade of this type results in a drug dealer acquiring, at least temporarily, a firearm. *See, e.g.*, *Doody*, 600 F.3d at 756. Such trades are also clearly "in furtherance of" drug trafficking crimes. Firearm possession occurs "in furtherance of" drug trafficking where it "further[s], advance[s], or help[s] forward" the offense. *United States v. Lomax*, 293 F.3d 701, 705 (4th Cir. 2002). Trading drugs for guns does just that. If drug dealers refused to do drug-for-firearm swaps some trafficking crimes, likely including some of those between Robinson and the burglars, would never occur. *See United States v. Frederick*, 406 F.3d 754, 764 (6th Cir. 2005). Trading drugs for firearms also furthers the underlying crime even where dealers and purchasers would be happy to use cash instead. Coming into possession during such trades completes (and thus necessarily furthers) each particular drug-for-firearm trafficking offense. *See Mahan*, 586 F.3d at 1189. Because his conduct falls squarely within § 924(c)'s possession prong, Robinson thus cannot demonstrate that his substantial rights were affected by the erroneous use instruction.

Even if Robinson somehow satisfied *Olano*'s third prong, we would not disturb his convictions. Plain error review exists to correct only the most grievous of unnoticed errors. *See United States v. Reid*, 523 F.3d 310, 316-17 (4th Cir. 2008). In making this "case-specific and fact-intensive" determination, *Puckett v. United States*, 129 S. Ct. 1423, 1433 (2009), Robinson's actual guilt or innocence is not the only consideration, but it is the most important, *see, e.g.*, *United States v. Jeffers*, 570 F.3d 557, 570 (4th Cir. 2009) (looking primarily to actual guilt under *Olano*'s fourth prong). In light of our conclusion that trading drugs for firearms is possession in furtherance and considering the evidence of those trades detailed above, there is no question that Robinson is guilty and would have been convicted anyway had the erroneous instruction not been given. We have repeatedly refused to notice errors in such circumstances. *See, e.g.*, *United States v. Foster*, 507 F.3d 233, 251-52 (4th Cir. 2007); *United States v. Williams*, 152 F.3d 294, 300 (4th Cir. 1998).

Sustaining the convictions here fully accords with Congress's intent in § 924(c) to criminalize the sorts of drugs-for-guns swaps that regularly transpired in this case. Indeed, if we narrowed § 924(c)'s possession prong not to cover this behavior, the provision would be vitiated. Drugs-for-firearms swaps squarely present all of the aggravated risks that stem from mixing drugs and guns—they increase the number of trafficking offenses that occur and, by putting firearms in the hands of criminal and often dangerous drug traffickers, they raise the already high risk of violence in trafficking to a new level. When Robinson's conduct so clearly falls under Congress's strong condemnation, we must decline to overturn his convictions. *See Williams*, 152 F.3d at 300 (reversing a use or carry conviction where the defendant was guilty under either because of an erroneous use instruction would impugn the criminal justice system).

## B.

Robinson further contends that the government introduced insufficient evidence to support his § 924(c)-related convictions. Though framed as an insufficiency claim, this argument also stems from *Watson* and the erroneous jury instructions. The government's evidence centered on Robinson's drugs-for-firearms trades, and throughout the proceedings the government and the district judge stated that these trades constituted "use" under § 924(c). Since *Watson* eliminates the possibility of convicting Robinson for these trades under the use prong, Robinson argues that the government did not introduce sufficient evidence that he violated § 924(c).

When reviewing the sufficiency of the evidence, we ask whether, viewed most favorably to the government, there is substantial evidence supporting the verdict. *See United States v. Smith*, 451 F.3d 209, 216 (4th Cir. 2006). As noted earlier, the indictment's § 924(c)-related counts each charged him under both prongs, a fact as fatal to Robinson's insufficiency claim as to his jury instruction claim. "As a general rule . . .,

'when a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged." *United States v. Hawkes*, 753 F.2d 355, 357 (4th Cir. 1985) (second omission in original) (quoting *Turner v. United States*, 396 U.S. 398, 420 (1970)).

This sufficiency claim, like many of the claims before it, runs directly into the wealth of evidence detailing Robinson's activities. Given that evidence, which we have reviewed at length, the jury necessarily found that Robinson traded drugs for firearms. This finding, as the district court noted, had more than enough support. As we held above, Robinson could not help but possess firearms in furtherance of trafficking. Because there was sufficient evidence to convict under the possession prong, there was sufficient evidence for Robinson's § 924(c)-related convictions despite the erroneous use instruction.

## V.

Robinson also takes issue with the § 924(c)-related aspects of his indictment and with the district court's treatment of them. He alleges that his indictment was duplicitous, charging multiple offenses within single counts. He also argues the district court constructively amended the indictment: the indictment's § 924(c)-related counts charged him with using and carrying and possessing in violation of § 924(c), but the district court instructed the jury that it could convict under either prong. We address these contentions in turn.

## A.

Duplicitous indictments present the risk that a jury divided on two different offenses could nonetheless convict for the improperly fused double count. *See, e.g.*, *United States v. Spencer*, 592 F.3d 866, 874-75 (8th Cir. 2010). But Robinson did not present this objection prior to the trial as called for by

Rule 12(b)(3) of the Federal Rules of Criminal Procedure. To enforce this requirement, the Rules add that "[a] party waives any Rule 12(b)(3) defense, objection, or request not raised by [the proper deadline]" unless it can show good cause. Fed. R. Crim. P. 12(e); *see also United States v. Colton*, 231 F.3d 890, 909 (4th Cir. 2000) (enforcing waiver of a multiplicity claim); *United States v. Price*, 763 F.2d 640, 643-44 (4th Cir. 1985) (same). Robinson fails to raise any argument approaching a showing of good cause.

Several courts, however, have held that newly raised duplicity claims that go beyond technicalities to allege that the conviction could have rested on an impermissibly divided jury deserve plain error review. *See, e.g.*, *United States v. Lloyd*, 462 F.3d 510, 514 (6th Cir. 2006); *United States v. Hammen*, 977 F.2d 379, 382 (7th Cir. 1992); *United States v. Gordon*, 844 F.2d 1397, 1400-01 (9th Cir. 1988). Out of an abundance of caution, we address and reject Robinson's duplicity claim under that standard as well. Even assuming that § 924(c) creates separate offenses and that the indictment's conjunctive charges were plainly duplicitous,[4] there is considerable doubt whether Robinson can demonstrate an impact upon his substantial rights and no doubt at all that he cannot demonstrate a miscarriage of justice.

Robinson likely cannot demonstrate prejudice because the jury necessarily credited the drugs-for-firearms evidence in convicting Robinson and because such trades constitute possession in furtherance. As a result, a juror willing to convict under the erroneous use instruction would have been willing

---

[4]Both of these assumptions are debatable, particularly the second. Regarding error, as mentioned above the number of offenses in § 924(c) is unsettled. Regarding plainness, the question was open at the time of trial and remains so now. *See, e.g.*, *United States v. Kilbride*, 584 F.3d 1240, 1255 (9th Cir. 2009) (no plain error where "the relevant law . . . was highly unsettled"); *United States v. Gamez*, 577 F.3d 394, 400 (2d Cir. 2009) ("Typically, we will not find plain error where the operative legal question is unsettled.") (internal quotation omitted).

to convict under the possession prong. *See, e.g.*, *United States v. Davis*, 306 F.3d 398, 416 (6th Cir. 2002) (rejecting duplicity claim under plain error review where unanimity was assured). Although the use instruction was itself erroneous, we have already rejected Robinson's independent challenge to that error and will not accept it here under the guise of a duplicity challenge.

We would also reject Robinson's duplicity claim under *Olano*'s fourth prong. To overturn Robinson's conviction because of a good-faith charging mistake—one that might not even have been a mistake—where the evidence demonstrated he traded drugs for firearms and thereby violated the possession prong would place form above substance and lessen public confidence in the criminal justice system.

## B.

Robinson also argues that by charging the jury that it could convict Robinson if he violated *either* the use or carry prong *or* the possession prong, the district court constructively amended his indictment. That is, because the indictment charged that he violated both prongs, Robinson argues that the district court's instructions inappropriately broadened the possible bases for conviction from both prongs to just one or the other. Robinson failed to raise this issue below, but in this circuit constructive amendments are erroneous per se and require reversal regardless of preservation. *See United States v. Foster*, 507 F.3d 233, 242-43 (4th Cir. 2007); *United States v. Floresca*, 38 F.3d 706, 714 (4th Cir. 1994) (en banc).

We can easily reject Robinson's constructive amendment claim. Well-settled precedent supports the district court's instructions. "[W]hen the Government charges in the conjunctive, and the statute is worded in the disjunctive, the district court can instruct the jury in the disjunctive." *United States v. Perry*, 560 F.3d 246, 256 (4th Cir. 2009). Moreover, agreeing with Robinson here would upend settled duplicity doctrine

and let his already denied duplicity claim in through the back door. It is black letter law that duplicitous indictments can be cured through appropriate jury instructions. *See, e.g.*, *United States v. Mauskar*, 557 F.3d 219, 226-27 (5th Cir. 2009); *United States v. Kakos*, 483 F.3d 441, 445 & n.1 (6th Cir. 2007). If Robinson is right, though, all successful attempts at fixing duplicity are per se reversible constructive amendments. *Floresca* does not command any such result.

## VI.

Robinson makes a few final contentions. First, he argues that under the Double Jeopardy Clause his § 924(c) convictions bar his § 924(o) conspiracy conviction. Because the former require proof the substantive crime was actually committed while the latter does not, and the latter requires proof of agreement but the former do not, these convictions satisfy the Double Jeopardy Clause. *See Blockburger v. United States*, 284 U.S. 299, 304 (1932).

He also argues that his consecutive § 924(c) sentences accord with neither § 924(c)'s own meaning nor the prohibition against double jeopardy because his convictions had the same underlying predicate offense and stemmed from the same underlying course of criminal conduct. We rejected this argument in *United States v. Camps*, 32 F.3d 102 (4th Cir. 1994). Just as the defendant in *Camps* was properly sentenced for each individual act in violation of § 924(c), Robinson was properly sentenced for the separate drugs-for-firearms trades alleged in Counts 3 and 9.

Robinson argues further that he is not subject to mandatory minimums under § 924(c) because he was subject to a twenty-year mandatory minimum for the crack conspiracy. The statute reads: "Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who" violates the use or possession prongs is subject to at least a five-year mandatory mini-

mum. 18 U.S.C. § 924(c)(1)(A). As Robinson notes, we have already disagreed with his interpretation of the "except" clause. In *United States v. Studifin*, 240 F.3d 415, 423 (4th Cir. 2001), we held that the clause creates a "safety valve" for higher punishments: if "any other provision of law" imposes a higher sentence for conduct violating § 924(c), the district court should impose that sentence, not the lower one specified in § 924(c).

Though Robinson raised this claim to preserve it for possible further review, the Supreme Court's recent decision in *Abbott v. United States*, No. 09-479 (U.S. Nov. 15, 2010), eliminates that possibility. The Court held that § 924(c)'s "except" clause only applies where "another provision of law directed to conduct proscribed by § 924(c) imposes an even greater mandatory minimum." *Id.*, slip op. at 3. In other words, the Court agreed with *Studifin*'s "safety valve" reading of the provision. *See id.*, slip op. at 17 (quoting *Studifin*, 240 F.3d at 423). Because Robinson's greater mandatory minimum stems from the crack conspiracy rather than any § 924(c) firearm violation, he cannot benefit from § 924(c)'s "except" clause and was therefore properly sentenced.

## VII.

Robinson calls our attention to a host of categories, tests, and frameworks: Rule 33 factors, two-pronged *Brady* analysis, constructive amendments, the *Blockburger* test, and the like. We have conscientiously reviewed each claim. None of them, properly employed, provides Robinson his requested relief. But it is well also to take a step back and not lose the forest for the trees. Viewed from this broader perspective, two facts stand out. First, Congress has strongly condemned the precise kind of conduct for which Robinson stands accused—conduct that destroys communities, families, and individual lives. Second, overwhelming evidence presented at a fair trial demonstrated Robinson's guilt.

Robinson asks us to discount these facts and focus myopically on particular details—the unrelated misconduct of police officers marginally involved with his remaining convictions and the various technical aspects of the indictment and instructions to which he did not even object. To accept his invitation would contravene Congress's intent, value form over substance, and elevate doctrinal technicalities over common sense. The judgment below is therefore affirmed.

*AFFIRMED*