**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 14-4711**

———————

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

JOHN DOUGLAS BIRD, JR.,

Defendant - Appellant.

———————

Appeal from the United States District Court for the Western District of North Carolina, at Bryson City. Martin K. Reidinger, District Judge. (2:09-cr-00015-MR-DLH-1)

———————

Argued: October 29, 2015          Decided: January 15, 2016

———————

Before TRAXLER, Chief Judge, and AGEE and DIAZ, Circuit Judges.

———————

Affirmed by unpublished per curiam opinion.

———————

**ARGUED:** Ann Loraine Hester, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Donald David Gast, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee. **ON BRIEF:** Ross Richardson, Executive Director, Douglas E. Roberts, FEDERAL DEFENDERS OF WESTERN NORTH CAROLINA, INC., Charlotte, North Carolina, for Appellant. Anne M. Tompkins, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

———————

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

John Douglas Bird, Jr., an enrolled member of the Eastern Band of Cherokee Indians, was convicted in federal district court of attempted murder and other charges related to a 2008 shooting that took place on the Cherokee reservation. See 18 U.S.C. § 1113 (prohibiting attempts to commit murder "within the special maritime and territorial jurisdiction of the United States"); 18 U.S.C. § 1153(a) (providing that "[a]ny Indian" who commits certain offenses "within the Indian country, shall be subject to the same law and penalties as all other persons committing any of the above offenses, within the exclusive jurisdiction of the United States"). Bird thereafter filed a motion for a new trial based on newly discovered evidence that someone else committed the shooting. See Fed. R. Crim. P. 33. The district court denied the motion, and Bird appeals. Finding no reversible error, we affirm.

I.

A.

The evidence presented at Bird's trial showed the following. On Christmas Day, 2008, the victim, Merony George "Garce" Shell, was walking in the woods at the end of Bunches Creek Road, a mountainous area within the boundaries of the Cherokee reservation. He heard someone behind him, turned and saw Bird, a former co-worker of Shell's, standing near a gray

2

truck and holding a rifle at his side.  Shell responded by cursing Bird and saying, "You might as well kill me.  You've got the gun."  J.A. 156.  Bird shot Shell, hitting him multiple times in the face and on the arm.

After being shot, the next thing Shell recalled was driving back down Bunches Creek Road and wiping blood off his face; he could not recall how he got to his car or how long it had been since he had been shot.[1]  Shell wrecked his car while trying to pull over alongside the creek and tumbled out of his car, down the bank and into the icy water.  He managed to crawl back up the bank to the road where a neighbor, Theresa McCoy, found him and called the police.  When McCoy asked Shell who had shot him, he responded, "John Bird." J.A. 158.  McCoy testified that she had earlier observed Shell's car going up the road toward the woods at approximately 11:15 a.m., and that the wreck happened around 12:15 p.m.

Shell was taken to the hospital, where he was interviewed by FBI Special Agent Craig Sidwell.  Although Shell's injuries prevented Sidwell from conducting a full interview, Shell again identified Bird as the man who shot him.  Agent Sidwell passed

---

[1] It is unclear whether the gaps in Shell's memory were attributable to his injuries or the excessive amount of alcohol he had consumed before the shooting.

that information on to Detective Gene Owl of the Cherokee Indian Police Department.

Detective Owl learned through his investigation that Shell had visited Chuck Taylor on Christmas Eve, and Owl went to Taylor's house at approximately 7:45 p.m. on Christmas Day. As Owl walked onto Taylor's porch, he saw Bird standing in the living room. Owl and Bird made eye contact, and Bird ran out the back door and escaped into the woods. Bird was arrested on January 8, 2009, after police found him hiding in the closet of his father's home.

Detective Owl interviewed Bird the next day. Before Owl told Bird any details, Bird volunteered that he had heard that Shell had a wreck on Bunches Creek. Bird nonetheless denied any knowledge of the shooting, and he gave Owl an account of his whereabouts on Christmas Eve and Christmas Day. In an interview the next day with the State Bureau of Investigation ("SBI"), however, Bird eventually confessed to shooting Shell.[2] The SBI agent then turned Bird back over to Detective Owl for a follow-up interview.

In the follow-up interview, Bird again confessed to shooting Shell. Although Bird claimed that he could not

---

[2] Before confessing to the SBI agent, Bird took a polygraph examination and was told that he failed. The jury was not informed about the polygraph.

4

remember the entire event, he provided some details of the incident that he would not have otherwise known. Bird indicated that the shooting occurred "somewhere in the mountains," J.A. 234, and he also remembered that Shell cursed at him, saying something along the lines of, "Shoot me, bitch." J.A. 235. Bird further stated, "I didn't want to kill him. I made a mistake. I ain't no killer."[3] J.A. 236.

As noted, the testimony of Theresa McCoy placed the shooting sometime between 11:00 a.m. and 12:15 p.m. on Christmas Day. During Bird's first interview with Detective Owl, Bird claimed that he was at Dahne Driver's house having breakfast from 8 or 9 a.m. until 12:30 p.m. on Christmas Day. He then returned to his father's house until his grandmother, Myrtle Bird, picked him up and took him to her house to cut wood at around 12:45 p.m. Bird stated that he stayed at his grandmother's house until he went to Chuck Taylor's house at around 7 p.m.

Bird did not testify at trial, nor did he call his father or grandmother as witnesses. Instead, Bird called Nellie

_____

[3] Bird vomited at the beginning of the interview with Owl on January 9 and several more times the next day, including twice on the hour-long drive to the SBI office. Bird told Owl that his stomach was "messed up" and that he had to "drink [a] couple [of] beers every day to make him feel better." J.A. 220. At no point on either day did Bird ask for medical assistance or seek a delay of the interviews.

5

Littlejohn, who, at the time of the shooting, was the girlfriend of Bird's father. Littlejohn testified that she, Bird, and Bird's father went to Driver's house for breakfast but that they returned home between 11 and 11:30 and that she was with Bird at his father's house until Bird's grandmother picked him up at about 12:45 p.m. Littlejohn admitted on cross-examination that Bird's father told her that they would have to lie for his son and say that he was with them when the shooting took place. She denied, however, that she was lying on the stand.

The jury rejected Bird's alibi defense and convicted him of all charges. The district court sentenced Bird to a total of 330 months' imprisonment, and we affirmed his conviction and sentence on appeal. See United States v. Bird, 409 F. App'x 681 (4th Cir. Jan. 31, 2011).

B.

On May 29, 2012, Bird filed a motion for a new trial in which he contended that newly discovered evidence showed that a man named Justin Denig shot Shell. The district court ordered briefing on the motion and held an extensive evidentiary hearing. As developed through testimony and offers of proof made by Bird's attorney, the newly discovered evidence is set out below.

## 1. Deborah Caro

On July 11, 2011 – more than two years after the shooting – Deborah Caro went to the Cherokee Indian Police Department. At that time, Caro spoke to Detective Owl and claimed that her husband, Justin Denig, was the one who shot Shell in 2008. The government disclosed this statement to the defense, and Owl and the Federal Defender's office conducted a follow-up investigation into Caro's claims. Counting her first conversation with Detective Owl, Caro ultimately gave a total of four statements to Owl and James Allard, the defense investigator. Caro did not testify at the evidentiary hearing, as the district court permitted her to assert the marital testimonial privilege. The court permitted Bird to proffer the substance of Caro's statements.

In her first conversation with Detective Owl, Caro told Owl that Denig was physically abusive and that she had not reported him previously because she was afraid of him. She explained, however, that they had separated "this past Saturday" and that she had "t[aken] out a protective order on [him]." J.A. 523. Caro stated that on Christmas Eve, 2008, she, Denig, and Shell were drinking together at Caro's trailer, which was then located beside Caro's mother's home. Caro passed out at her mother's house, but Denig brought her back and put her to bed. She woke up at around 6 a.m. and found blood in the trailer. Caro told

7

Owl that she walked outside and saw Shell lying on the ground, bloody, with a "bullet mark" on his arm. J.A. 522. Denig was crying and said, "I shot him." J.A. 522. Caro stated that she told Denig that Shell needed to go to the hospital, but Denig refused and threatened to kill her unless she helped him put Shell into his car. Denig and Shell then left in Shell's car; Caro did not see Denig again until late in the day when he called and asked to be picked up at a place near Bunches Creek. Denig was muddy and wet, and he told Caro that he had gotten lost hiking and had fallen in the creek.

On August 5, 2011, defense investigator Allard briefly interviewed Caro while she was at work, and she again stated that Denig shot Shell. Allard gave Caro a copy of Owl's notes about the July 11 conversation, and she generally affirmed the substance of that statement. When Allard interviewed Caro again three days later, however, she recanted much of her previous statement. She denied ever saying that Denig admitted to shooting Shell, or saying that she saw a bullet mark, and she said that the blood she saw on Shell could have been from a bloody nose. Caro also told Allard that Denig, who had been arrested for assaulting Caro, had been released from custody and was again living with her.

On May 30, 2012, Detective Owl interviewed Caro again. In this interview, Caro talked about a night in the fall of an

unspecified year when she, Denig, and Shell were together at her trailer and were very drunk. She passed out and saw blood on the floor when she woke up. However, contrary to her July 11 account of the incident, Caro told Owl that she saw Shell and Denig -- each with a bloody nose -- sitting together inside the trailer, drunk but apparently content and without animus. She claimed that she and Denig helped Shell out to his car because he was drunk, but Caro did not claim to see any bullet wound or any injury other than the bloody nose. She said that Denig later went fishing, which was not unusual, and that he came back home wet after falling in the creek. Caro recanted her previous statement that Denig threatened to kill her if she did not help to get Shell into the car, and she indicated that her mother (who did not like Denig) told her to say that. See J.A. 665.

Caro stated that months after the confrontation with Shell, Denig told her that he shot Shell. Caro told Owl that she did not believe him and that she had not seen evidence of a shooting, and she described Denig's statements about the confrontation as "boasting" and "bragging." J.A. 645-46, 651, 659. Caro told Owl that she asked Denig about the shooting multiple times when Denig was sober and that Denig told her he didn't know what she was talking about. At the conclusion of the interview, Caro prepared a hand-written statement in which

9

she stated, "I am willing to testify to Justin's words, that he said he shot [Shell]."  J.A. 672.

## 2.  Justin Denig

At the evidentiary hearing, Justin Denig invoked his Fifth Amendment right against self-incrimination as to most of the relevant questions.  The district court received as offers of proof reports of two prior interviews of Denig.

Defense investigator Allard interviewed Denig on October 20, 2011, while Denig was in state custody because of a Florida probation violation.  In that interview, Denig claimed that he was drinking with Shell on Christmas Eve.  Denig said that around 1:30 a.m. Christmas morning, he saw Shell with his hand in his pants standing over the passed-out Caro.  Fearing that Shell was going to sexually assault Caro and might have a weapon, Denig hit Shell in the head with a skillet.  Denig told Allard that he and Caro dragged Shell outside and that Shell left in his own car, alone.  Allard asked Denig if he shot Shell, perhaps in self-defense, and Denig responded that he had only "busted his head" with the skillet.  J.A. 684.  Denig then asked Allard, "If I did shoot him in self-defense, can you guarantee that I would not go to prison one hundred percent?"  J.A. 684.  Allard stated he could not make that guarantee, and Denig again denied shooting Shell.  Denig added, "I wouldn't shoot him because people would hear the gun go off," and, "I was

probably just running my mouth if I told anyone I shot Garce."
J.A. 684-85.

On November 16, 2011, Detective Owl interviewed Denig. Denig told Owl substantially the same story about hitting Shell in the head with a skillet. Denig denied shooting Shell, and he refused to take a polygraph.

### 3. Garce Shell

In light of Caro's allegations, Detective Owl re-interviewed Shell on August 15, 2011. Shell stated that he was with two women on Christmas Eve 2008, not Denig and Caro. Shell said that he knew Denig and drank with him a couple of times, but he said that he was not around Denig and did not drink with him at any time around the shooting. Shell described the events of Christmas Day as he previously had, and he again identified Bird as the shooter. When asked if he knew why Bird would have been mad enough to shoot him, Shell explained that there was a rumor going around that he had given Bird's then-girlfriend prescription drugs in exchange for sex. Shell insisted the rumor was untrue, but he indicated that Bird was mad about it.

### 4. Other Evidence

Bird presented evidence that Denig made statements about shooting someone to Caro's nephew and to a woman who bought Caro's trailer, neither of whom believed Denig's story. Bird

11

also presented evidence that there were bullet holes in the door of the trailer and a large, dark stain on the carpet.[4]

Denig's state probation officer testified that, shortly after Allard's interview with Denig, she overheard Denig say on the telephone, "it happened the way we said it did, right?" J.A. 900. The probation officer also testified that Denig became very nervous when he was subpoenaed to testify at the evidentiary hearing and that he told her he thought about running away.

## C.

After considering the testimony and the offers of proof presented by Bird, the district court denied the motion for a new trial. The district court concluded that, given his assertion of his Fifth Amendment privilege, Justin Denig would not be permitted to testify at a new trial. The court also concluded that Denig's statements to law enforcement would be inadmissible at a new trial. As to Deborah Caro, the district court held that she was entitled to invoke the marital testimony privilege and that she therefore could not be compelled to testify at a new trial. The court held that Caro's statements

---

[4] Caro's nephew testified at the evidentiary hearing that Denig told him he shot someone who was trying to "get at" Caro and dumped the body in a cave near Bunches Creek. J.A. 794. When explaining the bullet holes in the trailer door, Denig told the buyer that "he had shot someone." J.A. 878.

12

to Owl and Allard were inadmissible hearsay, concluding that Caro's statements – which she twice recanted – "simply are not sufficiently credible to warrant admission under the applicable rules." J.A. 1170. The district court also concluded that even if all of the newly discovered evidence were admissible, the motion should still be denied because a new trial would not likely result in an acquittal.

## II.

The Federal Rules of Criminal Procedure authorize a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). We review the district court's denial of a Rule 33 motion for abuse of discretion. See United States v. Robinson, 627 F.3d 941, 948 (4th Cir. 2010).

As we explained in Robinson, for newly discovered evidence to warrant a new trial,

> (a) the evidence must be, in fact, newly discovered, i.e., discovered since the trial; (b) facts must be alleged from which the court may infer diligence on the part of the movant; (c) the evidence relied on must not be merely cumulative or impeaching; (d) it must be material to the issues involved; and (e) it must be such, and of such nature, as that, on a new trial, the newly discovered evidence would probably produce an acquittal.

Id. (quoting United States v. Custis, 988 F.2d 1355, 1359 (4th Cir. 1993). In addition, "[t]o obtain a new trial on the basis of after discovered evidence, that evidence must be admissible

13

in a new trial." United States v. MacDonald, 779 F.2d 962, 964 (4th Cir. 1985); accord United States v. Hill, 737 F.3d 683, 687 (10th Cir. 2013) ("Implicit in a claim of newly discovered evidence is that there is new evidence — that is, material that is admissible at trial.").

On appeal, Bird contends that the district court erred by denying his Rule 33 motion. Bird argues that because Justin Denig was not a party to these proceedings, the district court erred by permitting Caro to assert the marital testimony privilege. Bird also argues that the district court erred in concluding that Denig's out-of-court statements would be inadmissible in a new trial. Bird contends that this evidence would "probably result in acquittal at a new trial," United States v. Chavis, 880 F.2d 788, 793 (4th Cir. 1989), and that the district court thus abused its discretion by denying his Rule 33 motion. The government in response argues that the district court properly resolved the privilege and admissibility issues. The government also argues that even if all of the evidence were considered, the evidence would not "probably result in acquittal." Id.

We need not consider whether the district court properly applied the marital testimony privilege to Caro, nor do we need to consider whether the court properly found Denig's statements

to be inadmissible.[5]  As we will explain, we agree with the government that even if we consider the statements of Caro and Denig, the evidence is insufficient to satisfy the probability-of-acquittal requirement.  See Robinson, 627 F.3d at 948; Chavis, 880 F.2d at 793.

When considering Bird's motion to dismiss, the district court, as it was required to do, evaluated the credibility of the newly discovered evidence.  See United States v. Wilson, 624 F.3d 640, 663 (4th Cir. 2010) ("[T]he district court is required to make a credibility determination as part of its probability-of-acquittal determination." (internal quotation marks omitted)); United States v. McCullough, 457 F.3d 1150, 1167 (10th Cir. 2006) ("[T]he district court is to serve as a gatekeeper to a new trial, deciding in the first instance whether the defendant's proffered 'new evidence' is credible.").  As we have explained, "if the district court does not find a witness credible, it follows that the district court would not

_____

[5] We reject Bird's argument that Denig's invocations of his Fifth Amendment rights would have been admissible at a new trial.  See United States v. Branch, 537 F.3d 328, 342 (4th Cir. 2008) ("[P]lacing Johnson on the stand solely to invoke his Fifth Amendment privilege would lead to unfair prejudice in the form of both unwarranted speculation by the jury and the government's inability to cross-examine Johnson.  And any inferences that the jury might have drawn from Johnson's privilege assertion would have been only minimally probative — and likely improper — in any event." (internal quotation marks omitted)).

15

find the witness sufficiently persuasive to enable the district court to conclude that witness testimony would probably produce an acquittal at a new trial." Wilson, 624 F.3d at 663.

As to Deborah Caro, the district court explicitly found her statements to be "patent[ly] unreliab[le]." J.A. 1170; see also id. ("Caro's statements simply are not sufficiently credible to warrant admission under the applicable rules."); id. ("Caro has implicated Denig on numerous occasions only to recant her story later. As such, her actions render her statements to be far from trustworthy."). The record fully supports the district court's view in this regard: Caro first alleged that Denig had shot Shell at a time when she was separated from Denig and had obtained a protective order against him; there are significant differences in Caro's various descriptions of the incident between Shell and Denig; Caro recanted some of the most important of her accusations against Denig; one of Bird's witnesses told Detective Owl that "you can't believe a word [Caro] says," J.A. 871, and Caro herself effectively acknowledged her willingness to lie to police in order to make Denig look bad, see J.A. 665. In light of these facts, there is no basis for us to conclude that the district court abused its discretion in finding Caro's statements lacking in credibility. While the district court did not make express findings about the credibility of Denig's statements to third parties, the court

16

did recognize the relative weakness of that evidence, describing it as consisting only of "vague" statements that "do[] not even specifically identify Shell as the victim of any shooting Denig may have committed." J.A. 1171.

Weighed against this vague and less-than-credible evidence of Denig's guilt is the trial evidence showing Bird's guilt: Shell knew Bird and immediately and consistently identified Bird as the shooter, and Bird confessed to the crime and recounted details of the crime that he could not otherwise have known. Additionally, Bird fled from the police on the day of the shooting and was found hiding in a closet in his father's house when he was arrested. Given the strength and importance of the trial evidence, the district court rejected Bird's claim that his vague and unpersuasive new evidence would probably result in acquittal at a new trial. Under the circumstances of this case, we simply cannot say that the district court abused its discretion in its evaluation of the newly discovered evidence or its weighing of that evidence against the evidence presented at trial.[6]

---

[6] We reject Bird's argument that the district court should have considered the effect of the newly discovered evidence in light of an improved defense strategy "likely" to be pursued at a new trial. Brief of Appellant at 27. While the ultimate Rule 33 question is whether the evidence would "probably result in acquittal <u>at a new trial</u>," <u>United States v. Chavis</u>, 880 F.2d 788, 793 (4th Cir. 1989) (emphasis added), the new trial (Continued)

17

Accordingly, because we find no error in the district court's determination that Bird's new evidence would not make an acquittal probable, we hereby affirm the district court's denial of Bird's Rule 33 motion for a new trial.

AFFIRMED

contemplated is not a perfect trial with all holes in the defense shored up, but a new trial that includes the newly discovered evidence along with the evidence presented at the original trial. See United States v. Wilson, 624 F.3d 640, 663 (4th Cir. 2010) ("[A] district court should focus on whether a jury probably would reach a different result upon hearing the new evidence." (emphasis added)); id. ("[T]he district court cannot view the [newly discovered evidence] in a vacuum; it must weigh the [evidence] against all of the other evidence in the record, including the evidence already weighed and considered by the jury in the defendant's first trial." (emphasis added)). When analyzing the probability-of-acquittal factor, the district court thus properly disregarded counsel's assertion that an acquittal was even more likely in a new trial because he would present scholarly articles and expert testimony about false confessions and problems with eyewitness identifications -- evidence that could have been but was not presented in Bird's trial.

We likewise reject Bird's argument that the district court applied the wrong standard when denying Bird's Rule 33 motion. The district court's opinion states the correct probability-of-acquittal standard, see J.A. 1147, and it is clear enough from the court's overall analysis that it did not require Bird to prove that a new trial would result in an acquittal.