**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-4433**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

HASSAN SHARIF ALI, a/k/a Big Hassan,

        Defendant – Appellant.

Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro.  Catherine C. Eagles, District Judge.  (1:14-cr-00362-CCE-1)

Argued:  January 29, 2021               Decided:  March 19, 2021

Before WILKINSON, NIEMEYER, and THACKER, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Thacker joined.

**ARGUED:**  Emily Damsgaard Gladden, TIN FULTON WALKER, & OWEN, PLLC, Raleigh, North Carolina, for Appellant.  Stephen T. Inman, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  Noell P. Tin, TIN FULTON WALKER & OWEN, PLLC, Charlotte, North Carolina, for Appellant. John P. Cronan, Acting Assistant Attorney General, Matthew S. Miner, Deputy Assistant Attorney General, John P. Taddei, Criminal Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Ripley Rand, United States Attorney, Matthew G.T.

Martin, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee.

———————

WILKINSON, Circuit Judge:

Defendant Hassan Ali led a band of thieves on a spree of armed robberies in July 2013. A jury found him guilty of four counts of aiding and abetting Hobbs Act robbery, 18 U.S.C. §§ 2, 1951(a), four counts of carrying a firearm in connection with a crime of violence, *id.* § 924(c), and one count of possession of a firearm by a convicted felon, *id.* §§ 922(g)(1), 924(a)(2). On appeal, Ali brings three claims. He argues that the district court abused its discretion by refusing to sequester the co-defendant witnesses and by denying his motion for a new trial. He also claims that the uncertainty as to the predicate offenses for the § 924(c) convictions renders them invalid. We affirm the judgment of the district court.

I.

A.

In April 2013, Ali had debts that he could not repay. To solve this problem, he texted someone to whom he owed money that he was going to "go rob something." J.A. 532. Ali then planned the robberies with the four co-defendants in this case: Rodney Frazier, John Griffin, Jr., Hassan Hassan, and Kelvin Jacobs, Jr. Although these four men were not all well-acquainted with each other, Ali knew and brought all of them together for the robberies.

Ali first gathered with Hassan, Jacobs, and a few other men a couple of days before July 7 to plan the robbery of a Food Lion grocery store on Golden Gate Drive in Greensboro, North Carolina. Ali assigned roles to each co-conspirator and told them where to be for the robbery. On July 7, Jacobs made a diversionary call, Hassan served as lookout,

3

and Griffin went into the store shortly before 11 p.m. After entering the store, Griffin threatened the clerk with his gun, forced her to open the safe, took the approximately $800 within it, and fled the store. Later, Ali divided up the money.

On July 15, the crew robbed the Food Lion on Drawbridge Parkway. It followed the same pattern as the first robbery except with Frazier accompanying Griffin into the store to get the money. They grossed approximately $1,000 from the theft, and Ali again distributed the money afterward.

This pattern continued at the robbery of Jenny's Beauty, a Greensboro beauty salon, on July 20. The fourth and final robbery was of a Brink's armored truck in the parking lot of a SunTrust Bank branch on Eastchester Drive in High Point, North Carolina. In preparation for the robbery, Frazier stole a van, so they would not need to use their own cars. On July 25, Griffin drove the stolen van to the bank with Frazier and Ali. Jacobs again called 911 to send the police to a different location. Hassan monitored a police scanner in a separate car. Griffin and Ali, wielding firearms, jumped out of the van when the Brink's truck arrived. Griffin put a handgun to the guard and grabbed a bag of money. On the other side of the truck, Ali grabbed another bag and approached the second Brink's employee, Paytric Bratcher, with a shotgun. Bratcher drew his handgun and fired five times at Ali. Ali dropped his shotgun and the money bag and ran. Ali and Griffin met Frazier in the getaway car and left the scene. Later, Ali divided the $68,000 in cash they stole.

The five men were indicted on September 30, 2014. Before trial, all four of Ali's co-defendants accepted plea agreements offered by the government. In exchange for their

4

testimony at Ali's trial, the government dropped some of the charges against them—three of the eight against Griffin, three of the six against Jacobs, one of the four against Frazier, and four of the eight against Hassan.

B.

Ali's trial began on January 5, 2015. On the first day of trial, the government put on law enforcement witnesses, the Brink's employees, and other non-co-defendant witnesses. The next morning, Griffin was the second person to testify. He discussed the planning and execution of all four robberies and detailed the roles Ali and each co-defendant played in the series of crimes.

After Griffin finished and returned to the holding cell, the defense counsel requested a conference at the bench. Defense counsel was concerned that Griffin would go back to his cell and talk about his testimony with the other co-defendants. The court recognized that "[t]hey ought to be sequestered" and said that it would take care of it at the break, to which there was no objection. J.A. 328. Then, the government called its next witness.

The court recessed after that witness, excused the jury, and discussed the co-defendants' custodial arrangements with counsel. The marshal explained that Frazier and Jacobs were in one cell, Griffin and Hassan were in an adjacent cell, and Ali was in a third cell. J.A. 333–34. Defense counsel expressed concern that—given the co-defendants' proximity—they would discuss their testimony and "know which questions [we]re being asked." J.A. 334. Since the co-defendants were scheduled to take the stand intermixed with other witnesses throughout the trial, the court found that it could not ensure that they would not be in the holding cells together. Given the limited holding space in the building,

5

the court concluded that there was no arrangement that would keep all co-defendants out of talking distance with each other.

After summoning Griffin's attorney to the conference, the court inquired whether Griffin would be needed at any point that afternoon or if he could instead be returned to the Greensboro Jail. Griffin's attorney and the government's attorney acquiesced in sending him away, but Ali's attorney said he was unsure whether he would need to call him later that day. The court concluded that Griffin would need to be kept in the courthouse for the remainder of the day.

The judge then informed counsel that she would "instruct the rest of the witnesses not to discuss their testimony with other witnesses after they g[o]t off the witness stand." J.A. 336. She asked Griffin's attorney to tell his client the same. She also requested that the attorney help her remember to give that instruction to the other co-defendants after they testified. Defense counsel did not object to this course of action.

Subsequently, the jury returned from recess, and the government called five more witnesses. When the court dismissed the jury for lunch, it told the marshal that Griffin would not be needed for the day and thus could be returned to jail. Neither counsel commented on this instruction. After lunch, the government called Jacobs to the stand. He testified as to the organization, planning, and execution of the two Food Lion robberies and the Brink's armored car robbery. He neither participated in nor knew about the beauty salon robbery. On cross-examination, Jacobs testified that he had not talked to Frazier about the case while they were being held in the courthouse that day. He also said that he had never talked to either Frazier or Griffin about the case. After the government finished

6

re-direct, the court released Jacobs for the day but failed to instruct him not to discuss his testimony with the other co-defendants. The government called nine other witnesses before the court adjourned for the day. The court confirmed with counsel that Jacobs and Griffin would not be needed at the courthouse for the third day of trial.

The next day, Frazier was the fourth witness to testify. Frazier discussed the planning and execution of the Drawbridge Food Lion robbery and the Brink's robbery. He explained what each man did during the robberies, what weapons were used, and how the money was divided up afterward. On cross-examination, Frazier said that he was in a holding cell with Jacobs, Griffin, and Hassan but they did not discuss the case or their testimony. J.A. 601. When Frazier finished testifying, the court did not instruct him not to discuss his testimony or the questions he was asked with his co-defendants.

Following Frazier, one police officer testified briefly and then the government called Hassan to the stand. Hassan testified as to the planning and execution of all four robberies. On cross-examination, defense counsel asked Hassan about his custodial arrangements while he was waiting to testify. Hassan said he had shared a cell with Griffin the day before, and Griffin told him who was present in the courtroom but said nothing about the case. J.A. 639–40.

The government's final witness was an FBI expert in cell site location analysis. He plotted the data for the phone numbers associated with Ali and his four co-defendants on maps. These maps showed the men together at the planning house before the robberies, at the robbery sites when those robberies took place, and reunited after the robberies.

Consulting with counsel, the court finalized the jury instructions and verdict form. All agreed on a general verdict form that included only "guilty" and "not guilty" for each count without use of a special interrogatory for the jury to mark the theory of guilt. The court explained to the jury that the defendant could be found guilty of Hobbs Act robbery under either an aiding-and-abetting theory or a conspiracy theory. For the § 924(c) charges, she said that the "crime of violence" element could be satisfied by a guilty verdict on the robbery charges under either theory of guilt. The jury found Ali guilty on all counts.

C.

Following the trial, Ali had some disagreements with his attorney and began filing motions for acquittal and a new trial *pro se*. On March 11, 2015, he filed a motion for a judgment of acquittal and a motion for a new trial. Later in March, the court assigned replacement counsel. In May, the court denied his second counsel's request to withdraw as well as Ali's *pro se* motions. In June, Ali's attorney filed a second motion to withdraw.

A few weeks later, Ali filed another *pro se* motion for a judgment of acquittal and motion for a new trial. Attached to this motion was a handwritten declaration by Zeb Maggard, who alleged he was held at the courthouse with Ali's co-defendants on January 6 and 8. He claimed that "on both days these witnesses talked about their case and testimonies with each other." J.A. 990. He said they talked to each other "about how [their] testimony went" and "share[d] with them the questions and . . . answers." J.A. 990.

At the sentencing hearing, the court granted the motion to withdraw and allowed Ali to proceed *pro se*. The court considered Ali's motions for a judgment of acquittal and a new trial, permitted him to present argument on them, and rejected the first motion with

8

explanation and the second motion summarily. Ali was sentenced to total of 1,195 months of imprisonment: 235 months on each Hobbs Act robbery charge, to run concurrently; 60 months on the first § 924(c) charge and 300 months on each of the second, third, and fourth § 924(c) charges, all to run consecutively to each other and all other charges; and 120 months on the felon-in-possession charge, to run concurrently to the Hobbs Act robbery charges. Ali timely appealed, and we have jurisdiction pursuant to 28 U.S.C. § 1291.

II.

On appeal, the defendant raises three assignments of error. First, he claims the district court erred when it failed to separate the co-defendants while they were being held together at the courthouse awaiting their turn to testify. We review evidentiary matters such as the district court's sequestration order for abuse of discretion. *United States v. Rhynes*, 218 F.3d 310, 315 (4th Cir. 2000) (en banc) (plurality opinion).[1]

---

[1] The defendant argues that this issue should be reviewed *de novo*. Appellant's Reply Br. at 1. His suggestion that *Rhynes* requires *de novo* review of a sequestration order conflates review of that order with review of the district court's interpretation of the Federal Rules of Evidence. *Rhynes* does require *de novo* review of "a district court's legal interpretation of federal rules," 218 F.3d at 320, but that is not the same as review of a sequestration order, which is an evidentiary ruling, *see id.* at 315.

　Furthermore, an abuse of discretion review is the approach taken by our sister circuits in such circumstances. *See, e.g.*, *United States v. Engelmann*, 701 F.3d 874, 877 (8th Cir. 2012) ("Sequestration of most witnesses is mandatory when requested, but the district court is granted wide latitude in implementing sequestration orders, and the standard of review is abuse of discretion." (quoting *United States v. Collins*, 340 F.3d 672, 680 (8th Cir. 2003))); *United States v. Jackson*, 60 F.3d 128, 135 (2d Cir. 1995) (discussing trial judge's discretion in this sphere); *United States v. Solorio*, 337 F.3d 580, 592 (6th Cir. 2003); *see also* 4 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 615.07 (2d ed. 1997) (collecting cases). We see no reason to diverge.

## A.

Federal Rule of Evidence 615 governs the exclusion and sequestration of witnesses at trial. It requires the district court at the request of a party to "order witnesses excluded so that they cannot hear other witnesses' testimony." Fed. R. Evid. 615. This rule exists "to prevent the possibility of one witness shaping his testimony to match that given by other witnesses at the trial." *United States v. Leggett*, 326 F.2d 613, 613 (4th Cir. 1964). Rule 615 itself "serves only to exclude witnesses from the courtroom." *Rhynes*, 218 F.3d at 316 (plurality opinion). This interpretation follows common sense because it is only in the courtroom that a witness's speech is "testimony." When a court has denied a request to remove a witness from the courtroom, we have not required the defendant to show prejudice but rather have applied the rule "strictly" and vacated the conviction. *United States v. Farnham*, 791 F.2d 331, 335–36 (4th Cir. 1986); *see also Opus 3 Ltd. v. Heritage Park, Inc.*, 91 F.3d 625, 628 (4th Cir. 1996) ("[W]e construe the rule's exemptions 'narrowly in favor of the party requesting sequestration.'" (quoting *Farnham*, 791 F.2d at 335)). The *Farnham* court explained that this presumption of prejudice was necessary because it would be "almost impossible [for the defendant] to sustain the burden of proving the negative inference that the second [witness's] testimony would have been different had he been sequestered." 791 F.2d at 335.

When the complained-of conduct falls outside the Rule's text, however, this presumption does not apply. District courts frequently employ their discretionary authority to strengthen their sequestration orders outside of the courtroom. *See, e.g., Rhynes*, 218 F.3d at 316 (plurality opinion) (discussing district court's instruction "that witnesses were

not to discuss their testimony with one another"); *United States v. Headman*, 594 F.3d 1179, 1181 (10th Cir. 2010) (same); *United States v. Sepulveda*, 15 F.3d 1161, 1176 (1st Cir. 1993) ("Outside of the heartland, the district court may make whatever provisions it deems necessary to manage trials in the interests of justice, including the sequestration of witnesses before, during, and after their testimony . . . ."); *see also* 4 Weinstein & Berger, *supra*, § 615.06. In such circumstances, we have not presumed prejudice and have required a greater showing by the defendant that he was harmed by out-of-courtroom conversations between witnesses. *See United States v. Harris*, 39 F.3d 1262, 1268 (4th Cir. 1994). Several sister circuits have done the same. *See Engelmann*, 701 F.3d at 878 (remanding for an evidentiary hearing when there were no factual findings on which to determine prejudice); *Solorio*, 337 F.3d at 594 (requiring defendant to show prejudice); *United States v. Green*, 293 F.3d 886, 891–92 (5th Cir. 2002) (same); *Virgin Islands v. Edinborough*, 625 F.2d 472, 474 (3d Cir. 1980) (same).

The reasons for this different treatment are manifold. First, the Rule's text mandates courtroom exclusion of witnesses upon request; it leaves no discretion to the district court. Any further measures, however, imposed by the court are matters of discretion, not of right, and thus deserve the kind of deference we generally afford to questions of trial management. *See, e.g.*, *United States v. Smith*, 452 F.3d 323, 333–34 (4th Cir. 2006). Second, hearing in real time the lawyers' questions and the witnesses' responses presents the scenario most susceptible to the sort of testimonial tailoring that the court cannot remedy. But when witnesses are relying on memory during out-of-court conversations, they are more likely to transmit mistaken or incomplete recollections and thus more likely

11

to be caught on a thorough cross-examination by the defendant's lawyer. Finally, this differential treatment aligns with our approval of different remedies for violations of a sequestration order depending on the circumstances and the severity of the violation. *See Rhynes*, 218 F.3d at 322–23 (approving sanctioning the witness, corrective jury instructions, and broad cross-examination as possible remedies). We have even upheld a criminal contempt conviction for a witness whose violation of a sequestration order was willful. *See United States v. McMahon*, 104 F.3d 638 (4th Cir. 1997). This regime makes sense only in the context of treating core Rule 615 violations differently from violations at the Rule's periphery.

B.

With this framework in mind, we review the circumstances surrounding Ali's trial. No witness was in the courtroom while another was testifying, so the presumption of prejudice to the defendant under Rule 615 no longer applies. Thus we review the district court's actions for abuse of discretion.

Ali complains that the district court did not do enough to prevent his co-defendants from discussing their testimony with each other after they left the stand and returned to the courthouse's holding area. Faced with the building's limited space to hold the co-defendants, the trial court recognized the potential for the co-defendants to speak with each other. She thus instructed the attorney for the first witness to testify (Griffin) to tell his client not to speak about his testimony with his co-defendants. She also offered to have Griffin sent back to the jail. Neither the government nor Griffin's counsel opposed sending

12

him away from the courthouse, but Ali's counsel objected because he was uncertain whether he would need to call Griffin.

Ali cannot complain after the trial or on appeal about something he had the express opportunity to prevent. Sending Griffin back to jail after his testimony, as the district court offered, would have addressed Ali's concerns without prejudicing the presentation of his case. Granting relief on Ali's claim would encourage gamesmanship—that is, a defense counsel remaining silent rather than objecting to a supposed error. *See, e.g.*, *Puckett v. United States*, 556 U.S. 129, 134 (2009) (discussing the problems caused by defense counsel "remaining silent about his objection and belatedly raising the error only if the case does not conclude in his favor"). Allowing defendants to claim error after raising an issue with the trial judge and rejecting her reasonable solution would encourage litigants not to accept sensible accommodations and discourage trial participants from working together to devise practical solutions to difficult problems of witness location.

Furthermore, the opportunities that the co-defendant witnesses had to communicate with each other after testifying were limited. Griffin remained in the courthouse's holding cells only from the completion of his testimony before the morning recess until the lunch recess, when he was, in fact, sent back to jail. Jacobs testified in the afternoon, so he too was in the holding cell with Frazier and Hassan for only a limited amount of time from the end of his testimony to the end of the day. The following day only Frazier and Hassan were brought to the courthouse. There was only one short witness between their turns on the stand—again providing limited time for any collaboration.

13

Finally, the district court made appropriate allowances for defense counsel to cross-examine the co-defendants about whether they colluded on their testimony. This is one of the remedies this court has endorsed for addressing potential violations of sequestration orders. *See United States v. Smith*, 441 F.3d 254, 263 (4th Cir. 2006). And Ali's counsel took full advantage of his right to cross-examine the co-defendants. Asked whether he had talked to Frazier in the holding cell, Jacobs answered, "Not pertaining to the case." J.A. 426. And when asked whether he had ever talked to Griffin about the case, Jacobs said he had not. J.A. 427. Frazier also confirmed that he shared a holding cell with Jacobs, Griffin, and Hassan the previous day, but that they had not talked about the case. J.A. 601. When defense counsel questioned Hassan, he responded that Griffin had told them who was in the courtroom, but no one had talked about the case. J.A. 639–40. At no point did the district court curtail defense counsel's investigation of either possible collusion or the plea bargains the co-defendants had struck with the government.

This was not the easiest situation in the world to manage, what with four co-defendant witnesses and limited holding cells. In the context of defendant's requests and the building's constraints, the district judge handled this issue with care. At no point did Ali move for a mistrial or request a limiting instruction with regards to sequestration. And as noted, the court suggested removing Griffin from the building and allowed fulsome cross-examination. This was a fully sufficient response to Ali's request and we thus find no abuse of discretion here.

## III.

Second, Ali claims that the district court erred by denying his motion for a new trial based on new evidence. We review the district court's decision for abuse of discretion. *United States v. Lighty*, 616 F.3d 321, 374 (4th Cir. 2010).

## A.

Trial courts may vacate convictions "and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). However, these are highly disfavored motions that a court should grant only "sparingly." *United States v. Palin*, 874 F.3d 418, 423 (4th Cir. 2017) (quoting *United States v. Arrington*, 757 F.2d 1484, 1486 (4th Cir. 1985)). This follows from the historic respect that the Anglo-American legal system has had for a verdict by a jury of one's peers. *See, e.g.*, *United States v. Powell*, 469 U.S. 57, 65–69 (1984) (respecting finality of jury verdict despite possible inconsistencies); *Sparf v. United States*, 156 U.S. 51, 88 (1895) ("The law throws upon [the jury] the whole responsibility of ascertaining facts in dispute, and the judge does not attempt to interfere with the exercise of their unfettered discretion in this respect."); *see also* Matthew Hale, The History of the Common Law of England 260 (3d ed. 1739) (explaining that one virtue of the jury trial is its "unanimous Suffrage and Opinion of Twelve Men, which carries in itself a much greater Weight . . . to discover the Truth of a Fact, than any other Trial whatsoever").

Defendant suggests that the district court's failure to give an explanation directly responsive to his motion entitles him to *de novo* review. This contention is incorrect. Unlike in sentencing, the district court does not need to expound upon its reasoning in its denial of a new trial motion. *See, e.g.*, *United States v. Fowler*, 948 F.3d 663, 668 (4th Cir.

15

2020) (noting that sentencing court is required "to adequately explain the chosen sentence . . . to allow for meaningful appellate review" (quoting *Gall v. United States*, 552 U.S. 38, 50–51 (2007)). Even when the transcript does not explicitly show as much, "[t]rial judges are presumed to know the law and to apply it in making their decisions." *Walton v. Arizona*, 497 U.S. 639, 653 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002). And on appeal, "[w]e are not limited to evaluation of the grounds offered by the district court to support its decision, but may affirm on any grounds apparent from the record." *United States v. Smith*, 395 F.3d 516, 519 (4th Cir. 2005).

B.

To succeed on a Rule 33 motion based on new evidence, "a defendant must satisfy a five-part test by showing that (1) the evidence is newly discovered; (2) the defendant exercised due diligence; (3) the newly discovered evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence would probably result in acquittal at a new trial." *United States v. Moore*, 709 F.3d 287, 292 (4th Cir. 2013) (citing *United States v. Chavis*, 880 F.2d 788, 793 (4th Cir. 1989)) ("*Chavis* Test"). Since "[t]he defendant must satisfy all five prongs," *United States v. Christy*, 3 F.3d 765, 768 (4th Cir. 1993), we focus on how he does not meet the first and the third.

Ali presents two relevant pieces of new evidence: a sworn declaration by himself recounting what he overheard in custody (Ali Declaration) and a sworn declaration of Zeb Maggard, who claimed to be in the same cellblock at the courthouse as the co-defendant witnesses (Maggard Declaration). *See* J.A. 883–84, 990. We can dispose of the Ali Declaration promptly because it is not newly discovered evidence. Although the

16

declaration was filed after the trial, its assertions are nothing more than Ali's observations during the trial. These observations were not new evidence because Ali was aware of them during trial and even claimed to have brought them to his counsel's attention. Thus, the Ali Declaration fails to meet the first prong of the *Chavis* Test.

The Maggard Declaration fails to satisfy the third *Chavis* prong because it is merely impeachment evidence. Such evidence "go[es] only to the credibility of a witness" and "does not generally warrant the granting of a new trial." *United States v. Custis*, 988 F.2d 1355, 1359 (4th Cir. 1993) (citing *United States v. Stockton*, 788 F.2d 210, 220 (4th Cir. 1986)). Here the Maggard Declaration calls into question the credibility of the co-defendants' claims that they did not discuss their testimony when they were being held at the courthouse. *See* J.A. 990. This "evidence does not directly support some alternate theory of the crimes, nor does it provide any legal justification for" Ali's actions. *United States v. Robinson*, 627 F.3d 941, 949 (4th Cir. 2010). Rather, the Maggard Declaration merely calls into question the co-defendants' honesty on an issue orthogonal to the defendant's guilt. *See id.* This is classic impeachment evidence that cannot satisfy the third prong of the *Chavis* Test.

Given the ample evidence that was adduced at trial against the defendant, the "new" evidence that Ali proffered in support of his Rule 33 motion came very late in the day (over four months after the trial ended) and would have hardly made any kind of difference. The district court ran a good trial, and there was absolutely no reason to do it over with all the drawbacks that retrials entail. We cannot countenance "fishing expeditions into the backgrounds of witnesses and insubstantial Rule 33 motions resulting therefrom" because

17

they "deprive witnesses of a decent sense of closure and undermine the finality of criminal proceedings to an unacceptable degree." *Id.* Thus, we find that the district court did not abuse its discretion and affirm the denial of Ali's motion for a new trial.

IV.

The final issue on review is whether the invalidity of one of the two theories of guilt in the jury instructions on the § 924(c) charges undermines the convictions.[2] Since the defendant did not object to the instructions at trial, we review for plain error. *See United States v. Cowden*, 882 F.3d 464, 475 (4th Cir. 2018). This requires Ali to "show (1) that the court erred, (2) that the error is clear and obvious, and (3) that the error affected his substantial rights, meaning that it 'affected the outcome of the district court proceedings.'" *United States v. Catone*, 769 F.3d 866, 871 (4th Cir. 2014) (quoting *United States v. Olano*, 507 U.S. 725, 732–34 (1993)). Even if all three elements are established, we do not correct the error unless it "seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Massenburg*, 564 F.3d 337, 343 (4th Cir. 2009) (quoting *Olano*, 507 U.S. at 732).

A.

When the district court instructed the jury on the Hobbs Act robbery charges and the § 924(c) charges, it told the jury that Ali could be found guilty under either one of two

---

[2] Section 924(c) provides for the punishment of persons who use or carry a firearm in, or possess a firearm in furtherance of, a crime of violence or a drug trafficking crime. 18 U.S.C. § 924(c)(1)(A). This subsection defines a crime of violence as a felony that "has as an element the use, attempted use, or threatened use of physical force against the person or property of another." *Id.* § 924(c)(3)(A).

18

theories. For Hobbs Act robbery, he could be found guilty "because he . . . aided and abetted the crime of interfering with commerce by robbery" or "because he conspired with others to commit that crime."[3] J.A. 790. The court said that the government did not need to prove both; rather "[o]ne [wa]s sufficient." J.A. 790. The court then explained the requirements for proving each theory. *See* J.A. 791–93. Next, the court turned to the first § 924(c) charge and instructed that the crime of violence element would be met if Ali had either "knowingly conspired to commit" Hobbs Act robbery "or aided and abetted in the commission of the robbery." J.A. 794–95. The court followed this pattern on the remaining counts.

Ali claims that the district court's instructions to the jury were improper because one of the two theories of guilt could not serve as a valid predicate for § 924(c). This was so because Hobbs Act conspiracy was not a crime of violence as required by the statute. To determine whether an offense qualifies as a "crime of violence," we apply either the categorical approach or the modified categorical approach. *United States v. Fuertes*, 805 F.3d 485, 498 (4th Cir. 2015). We employ the categorical approach for indivisible statutes—those "not containing alternative elements" such that "the jury need not agree on anything past the fact that the statute was violated." *Id.* (quoting *Descamps v. United States*, 570 U.S. 254, 258 (2013); *Rendon v. Holder*, 764 F.3d 1077, 1085 (9th Cir. 2014)).

---

[3] "Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both." 18 U.S.C. § 1951(a). The defendant was specifically charged with robbery, not extortion, in this case.

We use the modified categorical approach for divisible statutes—those "that list[] 'potential offense elements in the alternative,' and thus include[] 'multiple, alternative versions of the crime.'" *United States v. Bryant*, 949 F.3d 168, 173 (4th Cir. 2020) (quoting *Descamps*, 570 U.S. at 260, 262). Since the offenses supporting each theory of guilt are indivisible, we must apply the categorical approach to each to determine whether they are crimes of violence capable of supporting a § 924(c) charge.

First, we turn to the theory of Hobbs Act conspiracy. There is no room for doubt that there was an instructional error here. After the trial, we held that conspiracy to commit Hobbs Act robbery is not categorically a crime of violence and thus cannot serve as a valid predicate for a § 924(c) charge. *See United States v. Simms*, 914 F.3d 229, 233 (4th Cir. 2019) (en banc). This is so because conspiracy requires only that the government prove an agreement "to commit actions that, if realized, would violate the Hobbs Act," but "[s]uch an agreement does not invariably require the actual, attempted, or threatened use of physical force." *Id.* at 233–34. Thus, under the categorical approach, conspiracy can no longer serve as a valid predicate, and the district court's instruction that it could was in error.

It is equally clear that the error was plain. An error is plain if, "at the time of appellate consideration[,] . . . the settled law of the Supreme Court or this circuit establishes that an error has occurred." *United States v. Ramirez-Castillo*, 748 F.3d 205, 215 (4th Cir. 2014) (internal quotation marks and citations omitted). Since *Simms* established for this circuit that Hobbs Act conspiracy is not a crime of violence, we conclude that the instructional error was plain.

B.

The second theory of guilt, however, was a valid predicate for Ali's § 924(c) charges. Although we have yet to address whether aiding or abetting Hobbs Act robbery is a crime of violence that satisfies § 924(c)'s force clause, we have held that Hobbs Act robbery itself is a crime of violence. *See United States v. Mathis*, 932 F.3d 242, 265–66 (4th Cir. 2019). Thus, we need only determine whether aiding and abetting a crime of violence also qualifies.

In the context of the Immigration and Nationality Act (INA), Pub. L. No. 82-414, 66 Stat. 163 (1952), *as amended*, 8 U.S.C. § 1101 *et seq*., the Supreme Court has already answered an analogous question in the affirmative. *See Gonzales v. Duenas-Alvarez*, 549 U.S. 183 (2007). Like § 924(c), the INA requires the use of the "categorical approach" established in *Taylor v. United States*, 495 U.S. 575 (1990), to determine whether a particular conviction "falls within the scope of a listed offense" that makes an alien subject to removal. *Duenas-Alvarez*, 549 U.S. at 185–86; *see Fuertes*, 805 F.3d at 498. Mirroring the setup of the case at bar, the underlying state predicate in *Duenas-Alvarez* satisfied the categorical approach and the Supreme Court had only to determine whether aiding and abetting that crime was also a categorical match. *See* 549 U.S. at 188–89. The Court explained that, during the twentieth century, all fifty states and the federal government had "'expressly abrogated the distinction' among principals and aiders and abettors" who either helped before the criminal act or were "present at the scene of the crime." *Id.* at 189 (quoting 2 Wayne LaFave, Substantive Criminal Law § 13.1(e), at 133 (2d ed. 2003)).

21

Thus, since the law generally treats aiders and abettors the same as principals, the categorical approach must as well. *See id.* at 190.

That decision coheres with the principles of federal aiding and abetting law under 18 U.S.C. § 2.[4] Aiding and abetting is not a standalone criminal offense—rather, it "simply describes the way in which a defendant's conduct resulted in the violation of a particular law." *United States v. Ashley*, 606 F.3d 135, 143 (4th Cir. 2010). Section 2 "does not set forth an essential element of [an] offense," *id.*, so aiding and abetting a crime has the exact same elements as the principal offense. Because there are no new elements on which the categorical approach can operate, it is impossible for the analysis of aiding and abetting a crime to come out differently than the principal crime. Therefore, aiding and abetting a crime of violence is also categorically a crime of violence.[5]

We also note that this brings us in line with our sister circuits that have decided this issue. *See United States v. Richardson*, 948 F.3d 733, 741–42 (6th Cir. 2020) ("There is no distinction between aiding and abetting the commission of a crime and committing the principal offense. Aiding and abetting is simply an alternative theory of liability indistinct from the substantive crime."); *United States v. Garcia-Ortiz*, 904 F.3d 102, 109 (1st Cir. 2018); *United States v. Deiter*, 890 F.3d 1203, 1214–16 (10th Cir. 2018) (explaining that

---

[4] "Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal." 18 U.S.C. § 2(a).

[5] This is unlike attempted Hobbs Act robbery, which is not a crime of violence because it adds an element the Government must prove—"the defendant took a substantial step toward the completion of Hobbs Act robbery that strongly corroborates the intent to commit the offense"—and that new element can be satisfied by a "substantial step" that is not violent. *United States v. Taylor*, 979 F.3d 203, 207–08 (4th Cir. 2020).

"aiding and abetting is not an independent crime," *id.* at 1214 (citation omitted)); *In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016) (explaining that "the acts of the principal become those of the aider and abettor as a matter of law" (citation omitted)); *see also United States v. McKelvey*, 773 F. App'x 74, 75 (3d Cir. 2019); *United States v. Grissom*, 760 F. App'x 448, 454 (7th Cir. 2019). We agree with our sister circuits and conclude that aiding and abetting Hobbs Act robbery is a valid predicate under § 924(c)'s force clause.

C.

Having determined that the district court did instruct the jury on a valid predicate for the § 924(c) charges, we now return to the third prong of *Olano*. The defendant contends that we must use the modified categorical approach to determine what the predicate crime was for his § 924(c) charge, and because we cannot know whether the jury convicted him of Hobbs Act robbery conspiracy (an invalid predicate) or aiding and abetting Hobbs Act robbery (a valid predicate), we must vacate the conviction.

This fundamentally misunderstands what the categorical approach accomplishes and the nature of our inquiry under plain error review. The purpose of the categorical (and modified categorical) approach is not to determine what the predicate was—a factual question—but rather whether a particular predicate meets the requirements of a "crime of violence"—a purely legal question. *See Descamps*, 570 U.S. at 257–58 (explaining the categorical and modified categorical approaches). And, under that approach, we already know that conspiracy does not count and aiding and abetting does. With that knowledge, the third prong of the plain error inquiry is whether the inclusion of the improper theory of guilt "affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734.

23

Unlike the determination of whether a criminal offense is a "crime of violence," this requires a record-intensive factual inquiry.

Our precedent mandates this very approach. In fact, instructional errors have for over one hundred years been a classic example of the kind of error subject to plain and harmless error review. *See, e.g.*, *Holmgren v. United States*, 217 U.S. 509, 522–23 (1910) (considering prejudice to defendant in refusing to reverse an unpreserved jury instruction error). In *United States v. Robinson*, 627 F.3d 941 (4th Cir. 2010), we reviewed a § 924(c) conviction with one proper and one improper jury instruction on plain error. *See id.* at 953. We held that the defendant bears the burden of showing "'that the erroneous instruction given resulted in his conviction,' not merely that it was impossible to tell under which prong the jury convicted." *Id.* at 954 (quoting *United States v. Hastings*, 134 F.3d 235, 243–44 (4th Cir. 1998)).

This clearly forecloses the inquiry defendant suggests—he argues that there is uncertainty as to which theory (conspiracy or aiding and abetting) the jury adopted when it found him guilty of the § 924(c) counts. *See* Appellant Second Supplemental Br. at 9–13. He is correct that we do not know for certain which theory of guilt the jury accepted but fails to recognize that ambiguity is insufficient under plain error review. As we have frequently explained, a showing of uncertainty as to "whether the verdict returned by the jury rested solely on the mis-instruction" does not meet the defendant's burden of establishing actual prejudice under the third *Olano* prong. *Hastings*, 134 F.3d at 243; *see also, e.g.*, *Robinson*, 627 F.3d at 954; *United States v. White*, 405 F.3d 208, 224–25 (4th Cir. 2005) (holding the same for uncertainty in whether pre-*Booker* sentencing must be

24

vacated post-*Booker*); *United States v. Godwin*, 272 F.3d 659, 680 (4th Cir. 2001) (holding the same for uncertainty as to impact of district judge's inappropriately hostile questioning of defense witness); *United States v. Stitt*, 250 F.3d 878, 884 (4th Cir. 2001).

The appropriate inquiry is a "'case-specific and fact-intensive' determination." *Robinson*, 627 F.3d at 956 (quoting *Puckett v. United States*, 556 U.S. 129, 142 (2009)). We have conducted this analysis countless times without complication. *See, e.g.*, *United States v. Collins*, 982 F.3d 236, 241–42 (4th Cir. 2020) (finding no prejudice in jury instruction on § 922(g) charge because there was ample evidence that defendant knew "he had been committed to a mental institution," *id.* at 241); *United States v. Reid*, 523 F.3d 310, 315–16 (4th Cir. 2008) (looking at the facts to determine whether incorrect jury instruction prejudiced the defendant); *United States v. Myers*, 280 F.3d 407, 414–15 (4th Cir. 2002) (holding that overwhelming evidence at trial precluded finding of prejudice from jury instruction error). And the Supreme Court has mandated this typical harmless (or plain) error analysis in the very "context of a jury instructed on multiple theories of guilt, one of which is improper" and one of which is proper. *Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (per curiam).

Considering the overwhelming weight of the evidence the government presented at trial, the defendant cannot meet his burden of establishing that the outcome would have been different absent the improper instruction. Through the use of historic cell site location data, the government established that Ali drove to the robbery sites before the robberies occurred, that he was at the sites during the robberies (and no other time), and that he drove away from the sites after the robberies. Furthermore, the data also showed Ali with his co-

25

defendants at the times those co-defendants said the proceeds were distributed. Ali provided no evidence that calls into question the cellular data analysis. This is strong proof that Ali did more than simply conspire to commit robberies but that he assisted their commission.

The testimony from all four co-defendant witnesses provided further detail as to the role that Ali played at the locations the cell data place him. First, their testimony was consistent that Ali planned the crimes. *See* J.A. 280, 282–84, 287 (Griffin); J.A. 393–95, 398, 400–01, 404 (Jacobs); J.A. 548–50, 556–57 (Frazier); J.A. 611, 616–17 (Hassan). Second, he provided firearms and served as a driver in the robberies. *See* J.A. 276, 278, 281, 285 (Griffin); J.A. 549, 564–65 (Frazier); J.A. 611, 614–15, 617 (Hassan). Third, he helped Frazier steal the van for and carried a firearm during the Brink's robbery. *See* J.A. 288, 292 (Griffin); J.A. 557–61 (Frazier). During the Brink's robbery, Ali took a bag of money from the truck but dropped it while fleeing. *See* J.A. 292 (Griffin); *see also* J.A. 194–96 (Brink's security guard). Finally, after each robbery, Ali determined how the spoils were split. *See* J.A. 284–85, 294–95 (Griffin); J.A. 408 (Jacobs); J.A. 552, 569 (Frazier); J.A. 613, 618 (Hassan). All of this unrebutted evidence in the record supports a finding that Ali aided and abetted the robberies. Thus, we conclude that the improper instruction did not affect the defendant's substantial rights.

Since the defendant failed to show an abridgment of his substantial rights, there is no need to conduct the exercise of discretion analysis under the fourth *Olano* prong. *See United States v. Wallace*, 515 F.3d 327, 333 (4th Cir. 2008).

26

V.

Ali brought three different claims on appeal, and we have conscientiously reviewed each one. None are meritorious. It is noteworthy that he has generally misunderstood the applicable standard of review and requested we undertake a *de novo* examination of the district court's decisions. But one of the key responsibilities of an appellate court is to look at each alleged error through the appropriate lens. Plain error review not only encourages timely objections from trial counsel so that no error, plain or otherwise, occurs. It also allows appellate courts not to miss the forest for the trees. It allows us to sense from some remove that which really matters. So recognized England's great blind poet, who understood that, despite his lack of vision, his talents were not useless. *See* John Milton, *On His Blindness* (1655). Generations later, we know that he could see more of the human condition than many a sighted man. *See generally* John Milton, Paradise Lost (1667).

Stepping back, two things are clear. First, Ali has only unsubstantiated assertions that his trial went awry. Second, the district court endeavored diligently and successfully to conduct a fair trial and ensure justice was done. All in all, a just result was reached and we reject Ali's invitation to order a redo of this sound proceeding. As such, the judgment of the district court is

*AFFIRMED.*

27